The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is United States v. Herzon Sandoval, Appeal No. 181993. United States v. Edward Guzman, Appeal No. 182165. United States v. Eric Argueto-Larios, Appeal No. 182177. United States v. Cesar Martinez, Appeal No. 191026. All counsel on this case, the judges will be free to ask you questions both during your argument and immediately after the argument. And Attorney Rodriguez, I understand you have five minutes. You may proceed. Thank you, Your Honor, and good morning again. May it please the Court, with the Court's permission I would like to reserve one minute of my five minute argument for rebuttal. Yes, you may have that. Thank you, Your Honor. Expert testimony must be the product of reliable principles and methods. An expert must also be able to articulate how he has reliably applied those principles and methods to the facts of the case. And it is the Court's role as gatekeeper to require more than cursory assurances that the expert's testimony will, in fact, be reliable. Over Mr. Sandoval's objections, the Court failed to perform its gatekeeping role at Woods to provide both expert and lay witness testimony, despite its acknowledgment that Woods' proposed testimony had no methodology. Counsel, was there a specific request to the District Court for a Daubert hearing? Yes, Your Honor, there were two separate instances. As Sandoval's counsel, we filed a request for a Daubert-Cumho hearing, both in an original filing contesting the government's expert disclosure, as well as a supplemental filing that followed that once the government added additional details to that expert disclosure. Thank you. The Court even expressed doubts concerning whether Woods was really going to be providing expert testimony at all, versus impermissible summary testimony. The Court's reflections, its doubts, demonstrate why it should have conducted a Daubert-Cumho hearing to determine whether Woods' testimony was in fact permissible. Such a hearing would have allowed the Court to perform the required assessment of the nature of Woods' intended testimony, which the Court repeatedly confessed remained abstract, and determine whether the government's expert, which it compared to an anthropologist, had used principles and methods that could satisfy Rule 702. The result was not harmless error. The Court's abandonment of its gatekeeping function infected the trial from the start. Woods was the second witness to testify, and his summary testimony bolstered the testimony of the cooperating defendant with the apology. Just as a practical matter, if you have a complex criminal organization, are you saying you can never have an expert testify about that criminal organization as an expert? No, Your Honor. If someone can, what is the methodology that needs to be shown that would be different from what this agent showed? In other words, wouldn't it be based on experience in studying the organization of the group, and isn't that what the evidence in the record shows he was basing his opinion on? There were two issues with Special Agent Woods' testimony, Your Honor. First, there was a representation that it was based on experiences and certain data points that had been collected, but there was no explanation for exactly where certain information was coming from, and how Agent Woods had separated fact from fiction to ultimately come to his conclusion about what truly made up the organization's principles, and what would base his opinion in terms of what the organization's mission was, and whether or not certain crimes had been committed as part of a pattern that was representative of the organization versus just factual instances in this case. And I think that that's a result of Special Agent Woods having been both the leader of the investigation that occurred here in Boston... I understand the objection that he wasn't, the actual content of what he gave might not have been expert testimony, which is a separate point from the gatekeeper question, but as to the gatekeeper question, he did independently study this organization, at least from what the record demonstrates, and I don't really see you contesting that directly, so I'm just not really understanding what the specific gatekeeper challenge is to his credentials as an expert. His credentials, in terms of being a special agent that worked in the FBI with the gang task force, is not in question, Your Honor, but what we're talking about here is the principles... Counsel, that's time. And methods that he employed. Finish your answer. We don't have any idea who he talked to, how many witnesses he spoke to, how he determined whether or not certain cooperating witnesses or members of the gang that he spoke to were credible versus not credible, which is particularly relevant in a case where the government's number one cooperating witness turned out to be someone that was quite not credible and was actually committing crimes. I understand your argument to be that he relied on unreliable secondhand information and therefore a Daubert gatekeeping hearing had to be performed. Is that the argument? Yes, that's part of it, Your Honor. There's evidence that he... No, no. Just yes or no. Okay. I'm going to ask my... Judge, I have just one other question about all the number of issues that you raised in your brief that I did want to ask you about, which is the challenge to the prosecutor's statement. I don't know if it was in closing that your client said, go kill the Chiavalas. Yes. Could you just address that issue? The thing I'd like you to focus on is what is your contention as to the gap between what that statement represented your client to have said and what the record shows your client actually said? Yes, Your Honor. Yes. During the closing argument, the government did say that our client had specifically instructed members of the ESLS clique to go kill Chiavalas when in fact he never gave any such instruction. What the record could reflect is that our client was aware that MS-13 as an organization perhaps that others had committed murders or had engaged in assaults with rival gang members. I believe the specific quote is that someone had said that it beat a rival gang member or something like that. But again, a big gap between recognizing the possibility that this may have been occurring somewhere in the organization versus, and I'm talking about the wider MS-13 organization, not the specific clique, and an instruction from our client to go actually do commit murders out as coming from him as purported leadership of the gang. Judge Salyer and Judge Barron, do you have any further questions? I don't have at this time. No. No. Thank you very much, counsel. You have a minute of rebuttal later. Thank you, Your Honors. Attorney Rodriguez, please mute your audio and video. Counsel for Appellant Guzman, Attorney Schneider, please unmute your video and audio. Judge Lynch, with your permission, Attorney Schneider may proceed with her argument. Yes. Go ahead, please. Good morning, Your Honors. May it please the Court, Michael Schneider for Edwin Guzman. At the outset, I'd just like to request and reserve one minute for rebuttal. Yes, you may have it. I'd like to begin by addressing the first issue, which was the judge's failure to give a requested instruction that each co-conspirator had to have the specific intent that at least some member of the conspiracy commit two or more of the charged acts or type of predicate acts charged. The judge instead gave an instruction that used the term general understanding, and at the close of the judge's instruction, the defense counsel again typically objected to the judge's failure to give a specific intent instruction and to using what our position is was misleading and overly generous. Counsel, in the record, there were two separate objections. One was to the failure to give your instruction. Now, that's only error if your instruction is correct in the context of the entire instructions given. There were also two separate objections, I am told, in the record as to the use of the term general. However, in your brief on appeal, I don't see any argument objecting to the use of the term general. Instead, what I see is an argument as to your other objection as to specific intent. Okay? Now, I want to go back to that objection. As to that, what you call your specific intent instruction, it's not clear to me whether you were saying that there had to be a specific intent to join the conspiracy as to any two of the acts or that there had to be a specific intent as to specific acts that were charged as the racketeering predicate acts. Could you clarify for me? Yes. I believe that the argument that I was trying to make, and hopefully it was clear, is that the judge should have instructed that each defendant had a specific intent, one, to join the conspiracy, and then two, that some member of the conspiracy would commit two or more of the charged predicate acts or at least the type of charged predicate acts. In this case, the specific intent instruction was very important because there were a number of violent assaults of all kinds, which technically did not fit within the constraints of section 1961 sub 1. That section, the substantive recode... No, no, no. That's an argument of law. That's an argument of law, which you may or may not prevail on as to whether the offenses charged are, in fact, predicate acts. But we're talking about the jury instruction. The cases you cite to support your jury instruction do not say that. And our court has said they do not say that. So what is the support that you find for your proposed jury instruction? Well, the support was Ocasio, which in the context of the 371 Hobbs Act extortion case, construes Salinas, and then the Fourth Circuit, which concededly is an out-of-circuit, unpublished decision. Yes, and it also concerns an entirely different issue where there were different conspiracies involving different crimes, and the Fourth Circuit language is addressed to that problem, which is not, unless you tell me otherwise, is not the problem that we had in this case. So I think the Fourth Circuit unpublished language not binding on us isn't relevant anyway. I would submit, Your Honor... There's about five minutes remaining. Thank you. I would submit, Your Honor, that the Barnett case is in fact on point because there you had this woman who was considered essential to the gang's success, an integral part of the gang's operation, a conduit of information between gang members. And when the court looked closely at her conduct, and this relates, I guess, to point number standard, and a much harder standard for me conceivably, the court found that even though she was an integral part of this UBN conspiracy, that she did not have, as required by Salinas and Ocasio, she did not have the specific intent... Okay, so if we disagree with you on Salinas and Ocasio and whether they require the instruction, and I have asked you, what else do you have? You have an unpublished Fourth Circuit case. Is that it? Yes, I would submit, though, that the guidance in Ocasio... If you disagree with me in Ocasio, that could be difficult for my case, no question about it. But I would submit that Ocasio recognized, as this court did in the Flaherty case, which specific intents. The specific intent to join the crime and the specific intent that the underlying objectives of the conspiracy be committed. To my knowledge, the Flaherty case, which albeit is a 1981 case, has never been overturned. The lawyer for Guzman, the trial lawyer, in his fourth supplemental request specifically cited the Holden case, which also talks about the difficulty the courts have had in determining what kind of intent is actually required for proof of even a conspiracy. My point about... Before your time runs out, I don't want to cut you off from answering this question if you have more to say, but I wanted to make sure you get a chance to address the sufficiency challenge. And I want to, in particular, understand one aspect. Just want to say what your particular challenge is. Sure. As I understand the theory of the government, it appears to be dependent on the evidence, at least partially dependent, on the evidence of the statement from Sandoval as the leader of the group describing what one would understand from being jumped into the organization. Because it's in that exchange where he says that when one is jumped into MS-13, one is aware that one has jumped in to kill Chiavales or to look for Chiavales. So, I want to understand whether your sufficiency challenge is dependent on the jury believing that your client was unaware of that statement, or whether your sufficiency challenge proceeds even if the jury could reasonably find that your client understood that that statement had been made. Well, first, what I would want to say is that the issue of what the mission of MS-13 in particular was, was an issue that was contested. The government and its witnesses presented evidence that it was either to kill or look for, kill or attack, kill or stab. So, stabbing or attacking for 1961 and 1962 purposes are very, very different. So, is that a way of saying that even if your client was aware of this statement, your sufficiency challenge still stands, and so the fact that he was number two was not all that critical? Well, I would submit that the fact that he was number two was, I mean, really it was an honorific title. You're shifting on me, and I'm trying to isolate what your argument is. It's not bad for you. This is probably only good for you, but I just want to understand what you're actually arguing. Part of your sufficiency challenge is undoubtedly focused on the fact that he's number two rather than number one, and what that means about what he would have known about the organization's mission, etc., that Sandoval may have known things your client didn't. That's certainly a thrust of your argument. But I am asking you whether even if that were not true and a jury could believe on this record that as number two he probably would have known what number one knew, do you still have a sufficiency challenge, and if so, what is it? Yes, and I would just want to make clear when you look at the broad array of these MS-13 cases that have come before the court and that will continue to come before the court. Counsel, that's time. Answer your question and any follow-ups that Judge Barron has. When this court looks at the entire array of MS-13 cases, my client is probably the most distant from the underlying acts of criminality and the legal predicates that were charged. At the time that he joined the conspiracy, he was a young man, although the government didn't see fit to sort of indicate exactly what the circumstances his own jump in were. Counsel, get to the point. We've read your brief. We know about your client's background. So, you're making the point that he is more distant than your average MS-13 gang member. What else? Well, my point is that regardless of whether he sort of had a general understanding... You just froze. I'm sorry? You just froze. We didn't hear what you said. Please repeat it. The last thing you said was regardless of whether he had a general understanding. Does that help focus you? Regardless of when he joined the conspiracy at age 17, 18, whatever it was, and got a tattoo, regardless of whether he had a general understanding of what MS-13 was as a whole, I believe that the case law from Salinas to Ocasio to Barnett to Flaherty to the cases cited in my brief require more than this general understanding. And that when you look at, and I have some very specific footnotes that show the extent to which he was distancing himself from crimes during the entire course of the FBI investigation, the fact that he was being targeted, that he was resented by others for not being out on the street, there isn't one whiff of evidence that he directed anyone to do anything, that he had any advanced knowledge of any of these acts of criminality. You see, that point is, I think, the key point. You said there's no evidence of advanced knowledge. The government's theory is the evidence of advanced knowledge is his knowledge of the Now, and what I guess I'm saying is you could say, okay, because of where he was in the organization, there's no reason to think he would have known that. Or maybe your argument is, even if he knew that, the mission statement shouldn't be understood to be about this click. Or you could be arguing the mission statement because it says go kill or look for Chiavala isn't enough to show that the mission was to commit predicate acts. I'm not quite following what you're saying. As I say, the mission of what MS-13 is was hotly contested. Yes, there was some language. It doesn't help you if it's hotly contested on the sufficiency challenge. You have to show that it's not contestable. So on the government's evidence at trial, there was always testimony in the alternative that the goals of MS-13 included killing or attacking, killing or stabbing. Again, those or attacking or stabbing. If that's all the evidence showed about what the mission is, that can't be enough to show that the mission was to commit predicate acts. Is that the idea? That's correct. What's your best case for that position? Looking at the testimony of Mauricio Sanchez and Hernandez-Miguel. What precedent supports the idea that an alternative formulation like that in which the mission is to commit a predicate act or not to commit a predicate act shows that they have not got an agreement to commit predicate acts? I don't have a case at hand. I'd be happy if your honors were willing to give me the opportunity to present a 28-J letter within the next couple of days. Yes, we'll allow that within five days. The government will then respond within five days or after. Okay, any further questions of this council? The last question is just on the accessory after the fact with respect to the sentencing provision. Could you just give me a sense of... I can't seem to find any authority that supports your positions, but there's not a whole lot of authority on it. Maybe just run through for me what the argument is as to why that doesn't involve murder. Attempted murder or assault with the intent to commit murder under Massachusetts law, which is I understand how 1961 and 1962 works, it incorporates the provisions of the state law crimes, requires proof of the specific intent to kill. In this case, Hernandez Miguel was told that at the park, there were 12 chavalas who were starting problems with other members of MS-13. On his arrival, he doesn't say, let's go after them. He says... You're not making the argument that he was an accessory after the fact at most to the murder, correct? No, well, actually, I don't believe that he was an accessory after the fact, because first of all, it wasn't to attempted murder. The police officer who shows up tells the sister that there was a single stab wound to the chest that may be superficial, it may be fatal, but it may be superficial. In a typical Massachusetts accessory after murder case, or at least in a murder case, the Commonwealth would be spending two days with forensic evidence, medical hospital documents about the nature of minor chavalas stab wounds. They would have asked. I thought your argument to us was a legal one as well, which is that even if the evidence showed by preponderance that he was an accessory after the fact to the murder, it would not meet the involving murder standard, and that's what I was asking you about. Could you just address that issue? Sure, well, briefly with respect to that issue, yes, you know, there are dictionary definitions of the word involving that are and can be extremely broad, and the government has certainly pointed to some of the broadest interpretations of that term textually. But the problem is that it has no limiting, the government's interpretation has no limiting principle in provision, and in principle, a misprision of a felony where the underlying felony is a murder, could put that all of a sudden under the rubric of 1961 sub one, and I would submit that's probably not what Congress intended. All other kinds of crime, inquiry crimes involving murder, have a very malicious form of intent connected to it, or a malicious form of mens rea connected to it, and some very malicious form of evil form of actus reus. And in the case of an accessory after, what we have is someone in this case who may have heard something, and I have some issues about, under mass law, whether he had the substantial facts. Counsel, okay. You've got 30 seconds. Give a direct answer, please. Congress didn't intend this, despite its use of the term involved, because what? Because the broadest interpretation of the word involving has no limiting principles, and it would cast within its nets this kind of an accessory after murder that involves pouring tequila on someone's wounds. Okay, thank you. Judge Barron, do you have any further questions? No, thank you. Okay, we'll hear from the next counsel, please. Attorney Snyder, please mute your audio and video. Could Counsel for Appellant Martinez, Attorney Maidman, please unmute your audio and video, and Judge Lynch, with your permission, Attorney Maidman will proceed with argument. Please. Good morning, Your Honors. May I reserve one minute of rebuttal time? Yes, you may. Thank you. I would like to use my limited amount of time for addressing what I believe is the most important contention raised in the government's brief and perhaps the most important contention before the court, and that is whether United States v. Watts precludes consideration of the defendant's claims that the use of acquitted conduct violates the Fifth Amendment and the Sixth Amendment to the United States Constitution. Counsel, as I'm sure you recognize, you're swimming upstream not only against Watts, but against the body of First Circuit precedent following Watts. Yes, and against the body of precedent of every federal appellate court that has criminal jurisdiction. Yeah, but what do they know? Yes, I recognize that. No insult meant to our colleagues on other circuits. Proceed. No, I recognize that, and that's why I wanted to address this issue. I would suggest that a careful reading of the Watts case shows that the issue is not foreclosed. Counsel, let me see if I can truncate this discussion a little. If I understand your position from your brief, what you're suggesting is that this court, in our precedence following Watts, have misinterpreted Watts and cast its net too broadly. Is that a fair statement?  But this panel has absolutely no right not to follow our prior circuit precedent. We are bound by the law of the case doctrine. So we have to follow our existing circuit precedent, which interprets and applies Watts, so that the argument that you're making, as I understand your brief, and I think you're about to make now, may be an interesting argument to make on a petition for en banc review or in a petition for SIRIC, but it's necessarily ineffectual when made to a panel because our hands are literally tied. What's your response to that? My response to that is that I recognize that circuit law has addressed this. If you go back and take a look at the cases, there's not a lot of analysis of the Fifth Amendment issue or the Sixth Amendment issue, and quite frankly, I don't see why this court, maybe you will have to act in consistent with First Circuit law. But we can't. That's the point. It's not a question that we have to. The law of the circuit doctrine isn't the matter of an election on our part. It's a doctrine that binds us to a certain method of proceeding, and we are bound, unless you can point to some, say, new Supreme Court decision that puts this all in a new light or come within one of the other couple of very narrow exceptions that case law has carved out from the law of the circuit doctrine. But basically, the law of the circuit doctrine compels us to march in lockstep with prior panels, and for obvious reasons. We kind of have three judges of this court contradicting willy-nilly what three judges on a prior panel have said. The en banc court can do that, but we're not here on an en banc proceeding. We're here on a panel proceeding. My only response to that is that the Supreme Court cases since what? In particular, I would refer the court to footnote four in Booker. Counsel, that's time. Counsel, we will take it that you are laying the record to ask for a change in circuit law. Are there any other questions? No. Thank you, Counsel. You have one minute left if you choose to use it. All right. We will hear from the government now. Attorney Maidman, please mute your audio and video. Counsel for the U.S., Attorney Quinlivan, please unmute your audio and video. Attorney Quinlivan, there you go. Judge Lynch, with your permission, Attorney Quinlivan will now proceed with argument. Yes, do, please. Thank you, Judge Lynch, and may it please the court, Mark Quinlivan, on behalf of the United States. Let me take the two sentencing claims first because I think they can be dealt with in short order. Judge Selya, you're exactly right in terms of the claim regarding acquitted conduct. It's foreclosed both as a matter of vertical stare decisis and under the law of the circuit doctrine. This court has expressly read Watts as foreclosing the claim that the defendant is making. Most recently in the Henry case where the court said that a sentencing enhancement based on acquitted conduct violates a defendant's Fifth and Sixth Amendment rights as is foreclosed by Supreme Court and First Circuit authority, citing Watts and a slew of decisions by this court. To the extent the defendant is claiming that Supreme Court decisions subsequent to Watts have undermined the rationale of that decision, the Supreme Court has squarely said, most recently in Agostini v. Felton, that courts are to follow the decision on point and not presume that the Supreme Court has implicitly overruled one of its prior decisions. None of the decisions, either cited by the defendant nor are there any decisions, period, in which the Supreme Court has said that Watts has been overruled. Turning to the accessory after the fact claim, I would say that it is not simply that the government has picked a couple of definitions of the word involved. The definitions that we cite in our brief were adopted by the Supreme Court in the Shuler case and the alternative was adopted and applied by this court in the McKinney case. Under both definitions, accessorial crimes to murder or attempted murder would qualify. Is that just because of the breadth of the word involved and how it's defined in those cases? In other words, I think the force of the argument against you is that it's one thing for using the word involved for inchoate crimes that are prospectively thinking about the crime being committed. But if we open up involved to capture things that occur after the crime being committed, what limit is there to it? It would be an obstructive justice claim that happened to involve a murder, etc. It would seem to be just about anything in which the post-conduct related back to a murder. And that does give me some concern as to whether we're making the word involved mean related. I understand the point, Judge Barron. And I think my response would be to point to the Congress itself has said, and we cited in our brief, that the provisions are to be liberally construed in order to serve RICO's remedial purpose. And I think this would just sort of I mean, your position is that the word involved is the same as in relation to right. I'm sorry, I missed. I'm sorry, I missed that. Construction of the word involved would make it a synonym for in relation to. Well, not a synonym. It would be that closely connects or closely relates to that. That is the broader of the two definitions. Yes. And that that's the one that this court apply. I'm reading from two dictionaries adopted or used for for the word involved. Except if we accept your position, does that mean an obstruction of justice charge in a murder case constitutes involving murder? Under that, I would have to think about that. But under that definition. Yes. And, you know, as as a as a broader principle of statutory construction, you know, Congress courts have have said that when Congress uses a particular word, it typically has the same meaning across different different statutes. There's there's nothing at least that I've seen in in either the congressional record or the case law. It's just that the worry about the danger posed by somebody who would be planning a murder involved in the planning of it seems to me quite distinct from the danger involved in a person who didn't tell the truth as a witness about somebody else having committed a murder. And yet you would say the enhancement has to be treated identically as to both. And that seems quite puzzling. Mr. Quinlivan, I was a little surprised by your answer because the obstruction of justice charge is not, in fact, in front of us. And there it seems to me there is a better argument using the closely connect language that there isn't a sufficient closeness of connection. But that neither of those issues really are before us, given the facts of this case. Do you agree? Well, that's that's absolutely correct, Judge Lynch. And I would I would point out that, again, there are there isn't a whole lot of case law on this point. But the two cases recited included this, including the Second Circuit, have found in the RICO context that in light of the broad definition of the word involved, accessorial crimes would qualify. Well, I suppose the argument can be made that it is precisely in RICO predicate act cases that Congress would be most worried about people lying to the court. But I just don't think that issue is present before us. That's right. And I want you to turn to the sufficiency. But just I take it you're by your answer to Judge Lynch. You think the word closely connects could draw a line between obstruction of justice and accessory after the fact? You know, Judge Bear, I, you know, I have to think about obstruction of justice just because it doesn't didn't come up in this case. And I haven't thought through the full implications of that. But because the thought is just that if free prospective conduct versus retrospective conduct easily takes out obstruction of justice. In fact, that's one way. But if you say no, some post ex post conduct still could be involving murder, then we would need some line to explain why other types of ex post conduct also wouldn't be included. And I guess that would have to be the word closely. Is that the idea? Yes. Yes. Yes. That's correct. On the sufficiency claim, I would I would make two points there. First, as a general matter, there was ample testimony about what the purpose of not just MS-13 in general, but this particular click of MS-13 was. Your honors have noted when Hernandez Miguel testified, he said that he had he discussed with Sandoval that one understands that when one has jumped into MS-13, one's one's mission is to kill Shabala's. That's the purpose. No, no, that's not the quote. The exact quote is the exact quote is, quote, when one has jumped into MS-13, one is aware that one has jumped in to kill Shabala's or to look for Shabala's. Yeah. And it does go to the misstatement by the prosecutor, which is, is that or clause significant for purposes of determining whether the mission was to commit predicate acts? Because looking for Shabala's is not a predicate act. Absolutely. But Judge Baron, I point out that immediately following that quote. Yeah. Hernandez and it's on the next page of the transcript. Eleven fifty two of the joint appendix. Hernandez Miguel testifies. That's the main mission of MS-13 to kill Shabala's there. In addition to that, there was ample testimony. Excuse me, Mr. Quinlivan, is it in the context of the trial as a whole? Is it reasonable to construe the phrase or to look for Shabala's as being tantamount or to look for Shabala's for the purpose of killing them? Yes, there was testimony of other members that whenever one would see a member of the 18th Street Gang, they would either go out to kill or to stab. And in addition, for example, in the Joel Martinez. Excuse me, Judge Baron is trying to ask a question. I'm sorry. The problem with the or stabbing is that stabbing is not a predicate act. Well, stabbing is an armed assault with intent to murder. Stabbing would be a predicate act. Yeah, but it's just but not all stabbings are armed assaults with attempt to murder, are they? I think if you if you stab somebody. Well, I I'll have. Yes, I see. Under the conditions are with an intent to murder. I mean, how could that be? I'm thinking of the I mean, it's in the guidelines context, but in the guidelines context, certainly armed assault with intent to murder. Under Massachusetts, if they said the goal was to kill or commit armed assault with intent to murder, there'd be no problem. But it's armed. It's go kill or stab. And then the question is just, OK, you're I mean, I just think you got to address that or doesn't matter is the point. It doesn't it doesn't matter. There was a ample testimony in this case about not just what the intent of this click was to do, but what this click, in fact, members of this click, in fact, did. The jury heard evidence that members of the click either themselves or assisted MS-13, other MS-13 members in committing murders, attempted murders and armed assault. I understand that. But I thought and I appreciated this aspect of your argument. But maybe you're now saying it's an alternative argument. I had understood your argument to be that for purposes of proving the agreement, you were not relying simply on the acts that were taken and then say from those acts alone, one could infer an agreement for them to have been committed. I thought the argument was in light of the statements about mission, one could conclude that there was an agreement for acts of that type to be committed. And the proof of the acts made it clear that that was not idle chatter. And it was quite a reasonable thing to believe that that makes the mission statements absolutely critical to your argument for the sufficiency of the evidence to agreement. That's how you put it in your brief. So if that's right, then I think you do need to address the significance of the or point. And I don't quite understand what the answer to it is. Maybe there is one, but I'm just trying to figure out what it is. I think you take the mission statement and the other testimony. Sandoval, for example, during when he was talking with members of the clique about that they were no longer to be in the East Coast program, saying that many of us here have killed and we deserve respect. When in the beat in ceremony, it was mentioned that Joelle Martinez had committed two attempted murders in short order. Sandoval said he wasn't doing anything wrong. That's what he's supposed to be doing, homie. So you take all of those statements about the mission of this clique of MS-13 against the background, as you note, Judge Barron, of what members of this clique actually did. And there was, in light of all of this here, agreed that either they or a conspirator would commit two or more predicate acts. Mr. Quinlivan, do I understand you to be saying that we understand this testimony isn't being made by law professors to a class in exacting legal terms. What I'm gathering from your brief and from what you're saying now is that when someone says our mission is to kill or to stab, that taken in the context of all the other evidence, that it was completely unreasonable to believe that that meant that there was really an intent to go out and nick someone in the arm with a knife. To believe that stabbing was just a method of killing that this particular clique happened to favor. Is that what your argument boils down to? Yes, that's right. And put much better than I could, Judge Selye. Yes, exactly. That's five minutes left, counsel. One other set of questions, Judge Lynch, if you don't mind. If that's the contention, with respect to Larios and Guzman, where you have the direct statements of Sandoval that you've cited to in support of the argument for the sufficiency, could you then just address two things? How does that same sufficiency analysis then track for Larios, who came in much later and after a lot of those statements were made? And then Guzman, who contends that he was somewhat distant. And then lastly, if you could just address the prosecutor's statement about go kill Chabalas and whether that is fair argument. So as to Guzman, you have the fact that you have the 2008 attack at Maverick Station, where after the fact, Hernandez Miguel calls Guzman. Guzman instructs him to take a cab to Chelsea and then picks him up. You have the fact that Guzman personally participated with Hernandez Miguel in the 2009 beating of a Chabala. You have the fact in May 12, 2015, in the stabbing of Mernar Acoa, that Hernandez Miguel goes to Guzman's residence. Guzman tells him what's happened. Guzman gets him fresh clothes and says he'll dispose of the clothes. You have the overall fact that he's the second in command, the second word of this clique, attends the meetings, collects dues. So I think based on you have the fact that at the beat-in ceremony, although my friend Mr. Schneider says that he didn't want to have Mr. Martinez beaten. In fact, Guzman says this dude is killed and look how relaxed he is. So based on all of that, yes, the jury could find that he met the requisites for a Rico conspiracy. As to Larios, it is true he only became a homeboy in 2013. But as we pointed out, actually there's evidence that he personally agreed to commit two or more predicate acts. One being that after he was shot at at a bar, he was given a click gun for the specific purpose of shooting Chabalas if they shot at him. And a jury could infer that he agreed and would intend to do so. And then he and Martinez went to Sandoval and asked for a green light to have CW1 killed because Larios believed that he was the person who ratted him out at the Casa Mariachi restaurant. And Sandoval said that he would not give the green light until there was more proof that CW1 was a snitch. And a reasonable jury could infer from that not only that there was the agreement with Martinez, but that there was an implicit understanding with Sandoval that if there was more evidence that CW1 was a snitch, a green light would be given and he would be able to kill CW1. So that would be my answer. I think that the prosecutor's statement was a fair paraphrase of the testimony from Hernandez-Miguel, that one understands that one's mission is to kill or look for Chabalas. And as I point out, and again, on the very next page of the testimony, Hernandez-Miguel says that's the main mission of MS-13, to kill Chabalas. I know I have just, I do want to get quickly to the expert testimony. Mr. Quinlivan, I'm less concerned about the expert testimony than I'm concerned about what seems to be a theory in your brief, which I don't think is supported by our law, that the instruction actually given using the term general was an approved instruction. I don't, the word itself makes me a little bit uneasy, to be candid. And it is true that in an earlier case, that language was used, but in that earlier case, we did what you argue must be done in this case, which is to look at all of the instructions in their entirety. And if you do that, then it's quite clear. But are you asking this court to put an imprimatur on the term general? No, Judge Lynch. I think our point on that was that the specific objection made by the defendant was to the use of a single sentence in the background definition of a conspiratorial agreement. And that that same language had been approved by this court in Barnes and in subsequent cases. On a macro level, you, of course, take the instructions and look at the instructions as a whole. And as we've set forth in our brief, the district court in detail spelled out the elements of RICO conspiracy, including saying that the defendants and their co-conspirator, he noted that the object of the conspiracy was to engage in a pattern of racketeering activity. He noted that the two defined a pattern of racketeering activity to be the the activity that included murder, attempted murder and illegal drug trafficking. Trafficking. The court said that the government must prove, quote, is that the defendants knowingly and willfully agreed to participate in the conspiracy charged in the indictment. There's a question for me, which is the this word general as a modifier for understanding keeps popping up in this instruction and we keep finding or as you're urging us, it's found to be OK because of other instructions around it without ever saying that instruction itself is a good one. The alternative instruction that's proposed of a specific understanding you object to because you think that would be misleading. Do you have a suggestion as I'm just curious, do you have a suggestion of what would be a better way of giving this instruction that would avoid this confusion? In other words, if specific doesn't work and general keeps having to be saved by looking at the other instructions, is there any advice that we could give a district court about how to proceed in the future that would avoid this problem? Mr. Quinlivan, before you answer the question, I do think it is worth some thought on your part and consulting with others in your office. I've already approved a 28 J letter from your opponent within five days. Why don't you file a 28 J letter with us as to Judge Barron's question within five days? And your opponents can, who have raised this argument, can respond to your 28 J within five days thereafter. Judge Barron, is that sufficient? I do want to, just to follow up, I do want to note again two points that when the court, in addition to the language we quoted in our brief, the court went on to say that the government must prove that the defendant intended to further an endeavor that would have satisfied or actually did satisfy the requirement of a pattern of bracketeering activity. And then in response to a question by the jury, and this is on the 17th day of the trial, the court gave an additional instruction, and it's found on pages 2223 to 2224 of the joint appendix, which I just want to read because I think it really dispels any argument that the jury misunderstood the law. Quote, and I also, to be clear again, the focus is on the defendants, what they agreed to do, and the issue is whether each defendant individually agreed that the enterprise would involve these types of bracketeering activity. It's not a finding alone that the enterprise involved the bracketeering activity. It's that these defendants agreed that the enterprise would involve these particular types of activity. And your focus again should be on each defendant, each individual defendant, and what they did or did not agree to do. Okay. Now I'm going to ask my colleagues whether they have any further questions for you. I'm content. I'm fine. Okay. Thank you, Mr. Quinlivan. We're going to hear rebuttal argument. If there is anything which totally catches you by surprise, you may then ask for one minute of rebuttal. But otherwise, don't avail yourself of that privilege I've just extended. Understood, Your Honor. Thank you. Okay. Thank you. Now, go ahead. Sure. I was going to say, Judge, Attorney Rodriguez has reserved one minute for rebuttal, and she was the first one to speak. So if she would please unmute, and she has one minute. Yes, Your Honor. May I proceed? Yes. Thank you. With the one minute that I have, I just want to quickly address some of the statements that Attorney Quinlivan attributed to Mr. Sandoval, which are certainly not as clear as he portrayed within the record, specifically the conversation with Hernandez regarding what the mission of MS-13 is. If you go back to the transcript, you can see that they were talking about what it means to become a member of ESLS, and then the questioning actually shifts to then what is the mission or what does MS-13 as an organization do. So on the one hand, Hernandez-Miguel talked about what he understood was expected of him as a member of this specific clique, and then the conversation becomes much more general. Additionally, Attorney Quinlivan talked about certain statements that Mr. Sandoval purportedly made during the animal meeting, and one of those was that he was, you know, animal, quote, unquote, did not do anything wrong. That's time, counsel. Killed, and I just want to say that both of those statements have been contested, and again, go to the credibility of the government's expert witnesses about how they determined who was actually speaking and what was actually said at those times. Okay, thank you. Judge Lynch, Attorney Schneider was going to follow through with one minute of rebuttal. If he could unmute his audio and video. All right, go ahead, Attorney Schneider. Yes, thank you, Your Honor. I would just like to briefly point out with respect to this critical issue about the MS-13 mission is the prosecutor, while not exactly a law professor, certainly had extensive knowledge of the law and had done a lot of research before giving his closing argument, and he pointed out that, in closing, the mission of MS-13 was to kill or stab rival members. He also pointed out that part of MS-13's mission was the commission of violence in general and that it wanted to control everything. If you look back at the indictment itself, you'll see, of course, that there are a series of five or six different missions, including control of territory and establishing dominance. Agent Wood himself also talks about controlling territory by violent acts against rivals. That's at Joint Appendix 662 to 664. Just to make the point that the or look for or stab or do violence is not fairly read to be the equivalent of killing or assaulting with an attempt to murder? That's correct, and I would also just point out if I could. On that point, could you assume that's right for the moment, that a jury couldn't infer in the way that Judge Shelley was suggesting a jury might infer what the or clause meant? What is the significance of the or clause itself? In other words, it's one thing if I say I'm only going to do stabbings and give your interpretation of stabbings, but if I say one of our missions is to kill or the alternative, why isn't the alternative enough in and of itself to say there was an agreement to commit predicate acts? It's not like he's disclaiming that killing would be one of the things we're agreeing to do. There's no indication that he's unhappy if that's one of the outcomes. So why isn't that enough to say that I have agreed to be part of an enterprise that's going to commit those predicate acts? I just don't follow that part of it. I would say that because in the context of MS members in ESLS, there was no evidence that until Joel Martinez was introduced into the clique, there were any murders. There's no evidence that there was on Sandoval's committee any murders or Guzman's committee any murders or any of the other fellows. And there was a lot of evidence that there was boasting about that. That's time, Counsel. And Sanchez, both specifically. Okay, thank you. I think we have one more rebuttal. Yes, Judge. Attorney Maidman has one minute. If Attorney Snyder could mute and unmute. Thank you. Thank you, Your Honors. One comment in response to the government's argument. The United States Supreme Court has never squarely addressed whether the right to due process, whether the right to a jury trial prohibits acquitted conduct sentencing. And unless the Court has any further questions, I rely on my brief. Okay, thank you very much. Mr. Quinlivan, were you caught by surprise by anything? Just one brief point, Your Honor. There was no change in the questioning when Hernandez-Miguel made the statements here. I'll quote them. The question was, okay, what did Casper and you discuss about that? That when one has jumped into MS-13, one is aware that one has jumped in to kill or to look for Chavales. Mr. Murphy, objection, Your Honor. The Court overruled. Then Hernandez-Miguel continues, that's the main mission of MS-13, to kill Chavales. It is a follow-up answer to the question of what he and Sandoval discussed. Just wanted to bring that to the Honor's attention. It's 1151 to 1152 of the joint appendix. Thank you very much. Well argued by all counsel. We appreciate it. I'm going to turn it over to the clerk now. There will be a pause before the argument in the next case. Thank you, Judge. That concludes argument in this case.